# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRENDA K. HOLLABAUGH, | ) |
| Plaintiff, | ) Civil Action No. 11-139 Erie |
| v. | ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District Judge.

## I. INTRODUCTION

Brenda K. Hollabaugh ("Plaintiff"), commenced the instant action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), denying her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401, *et seq.* and § 1381 *et seq*. Plaintiff filed her applications on October 6, 2008 alleging disability since December 28, 2005 due to degenerative arthritis of the right knee and a learning disability (AR 12; 154; 158-159).[1] Her applications were denied (AR 76-85), and following a hearing held on June 18, 2010 (AR 26-58), the administrative law judge ("ALJ") issued his decision denying benefits to Plaintiff on July 12, 2012 (AR 12-22).

Plaintiff's request for review by the Appeals Council was subsequently denied (AR 1-3), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are the parties' cross-motions for summary judgment. For the reasons that follow, the Plaintiff's motion will be denied and the Commissioner's motion will be granted.

---

[1] References to the administrative record [ECF No. 5], will be designated by the citation "(AR ___)".

## II. BACKGROUND

Plaintiff was 40 years old on the date of the ALJ's decision (AR 29). She has a high school education and attended some learning support classes while in school (AR 29; 32). She has past work experience as a fire restoration/working supervisor (AR 20; 160).

Plaintiff suffered a gunshot wound to the right knee in 1997 and has undergone five procedures since that time, with the last being in 2002 (AR 30). On April 16, 2008, Plaintiff was seen by Frank McLaughlin, D.O. at Conneaut Valley Health Center and complained of increased right knee pain (AR 257-270).[2] Physical examination revealed swelling, and she was instructed to use moist heat or ice on her knee (AR 270). An x-ray of Plaintiff's right knee dated April 21, 2008 showed degenerative changes with probable small knee joint effusion (AR 221).

On August 14, 2008, Plaintiff presented to the emergency room at the Meadville Medical Center and reported injuring her left knee after twisting it while stepping down (AR 213). Plaintiff reported moderate pain and mild swelling, but no tingling, weakness or numbness (AR 213). Moderate tenderness and swelling was found on physical examination with a limited range of motion secondary to pain (AR 213). X-rays revealed no evidence of a fracture and minimal degenerative changes were noted (AR 214; 223). Plaintiff was diagnosed with a sprained left knee, instructed to use crutches and wear a knee mobilizer (AR 214).

On August 20, 2008, Plaintiff was seen at Conneaut Valley by Joseph Mercurio, D.O., who reported that Plaintiff's left knee was tender anteriorly in the subpatellar area on physical examination, and that she had significant pain during testing (AR 267). He diagnosed her with a left knee sprain with possible ligament involvement and prescribed Naproxen (AR 267). An MRI of Plaintiff's left knee on August 31, 2008 showed trace left knee joint effusion with a small amount of fluid along the inferior margin of the patella (AR 224).

Plaintiff was evaluated by Vincent Paczkoskie, M.D. on October 6, 2008 and reported that she experienced pain with walking, running, sitting or standing (AR 255). On physical examination, Dr. Paczkoskie found her knees had valgus alignment with a normal range of motion (AR 255). She had some crepitus bilaterally, right greater than left, and anterior joint

---

[2] Dr. McLaughlin is no relation to the undersigned.

line tenderness was also noted bilaterally (AR 255). She was neurovascularly intact distally (AR 255). Dr. Paczkoskie found the x-rays demonstrated moderate degenerative joint disease of Plaintiff's knees bilaterally, and that an MRI of Plaintiff's left knee showed trace effusion (AR 255). He diagnosed Plaintiff with bilateral knee degenerative joint disease with a significant patellofemoral component (AR 255). Dr. Paczkoskie recommended physical therapy, as well as rest, exercise and "good shoe wear" (AR 255). He further discussed the role of weight reduction, and noted that if Plaintiff's condition failed to improve with physical therapy, injection therapy would be the next step (AR 255).

Plaintiff returned to Conneaut Valley on February 9, 2009 and was seen by a nurse practitioner for complaints of knee pain (AR 262). Physical examination revealed bilateral crepitus (AR 262). Plaintiff acknowledged she had not followed Dr. Paczkoskie's recommendation, and had not attended physical therapy in seven years (AR 262). She was assessed with knee pain, and physical therapy was again recommended (AR 262).

Plaintiff was seen by Dr. McLaughlin on March 19, 2009, who noted Plaintiff was "doing well" (AR 257). Physical examination revealed no cyanosis, clubbing or edema in her lower extremities, her reflexes were +2/4, and her muscle strength was 5/5 and equal in both her upper and lower extremities (AR 257). Dr. McLaughlin assessed her with chronic knee pain and referred her to a pain clinic (AR 257).

On April 30, 2009, Plaintiff underwent a consultative examination performed by Alexandra Hope, M.D. (AR 231-241). She reported that her right knee constantly ached, and that she also had sharp pains, daily swelling, stiffness and numbness (AR 231). Plaintiff stated that her knee gave way at times and her pain was exacerbated with prolonged sitting or standing (AR 213). She also complained of intermittent aching in her left knee with prolonged walking or standing (AR 231). Plaintiff reported that she was independent with mobility and daily living, and that she used a cane held with her right hand (AR 231). She was able to shop and drive short distances (AR 231).

On physical examination, Dr. Hope found moderate deformity and effusion of Plaintiff's right knee; swelling in the right popliteal fossa; crepitus in the right knee and mild creptitus in

3

the left knee (AR 232). She further found Plaintiff's right knee was tender but her left knee was not (AR 232). Dr. Hope found no ligamentous instability of either knee, and her straight leg raise testing was negative bilaterally in the sitting and supine positions (AR 232-233). Dr. Hope reported that Plaintiff sat restlessly, her sit/stand transition was "stiff", her gait was flat-footed and antalgic on the right, and heel-to-toe walk was performed briefly with right knee pain (AR 233). Dr. Hope assessed Plaintiff with, *inter alia*, chronic right knee pain with swelling, inflammation and range of motion loss; post-traumatic degenerative arthritis of the right knee; chronic intermittent left knee pain; and degenerative changes of the left knee (AR 234). Dr. Hope found Plaintiff's prognosis was "poor" until she had total knee arthroplasty in the future (AR 234).

Dr. Hope opined that Plaintiff could occasionally lift and carry up to ten pounds; stand and/or walk for one hour or less per day with an assistive device; and sit for eight hours per day with an alternating sit/stand option (AR 239). Dr. Hope further opined that Plaintiff was precluded from using foot controls, and could occasionally bend, but never kneel, stoop, crouch, balance or climb (AR 240). Dr. Hope also found additional manipulative and environmental limitations (AR 240).

On May 4, 2009, Abu Ali, M.D., a state agency reviewing physician, reviewed the medical evidence of record and concluded that Plaintiff could occasionally lift twenty pounds, frequently carry ten pounds, stand and/or walk for a total of at least two hours in an 8-hour workday, sit for about six hours in an 8-hour workday, and was unlimited in pushing and pulling activities (AR 242-248). He further found Plaintiff could occasionally climb, balance, stoop, kneel, crouch and crawl and had no manipulative limitations, but should avoid even moderate exposure to hazards such as machinery and heights (AR 244-245). Dr. Ali noted that Plaintiff was able to drive and care for her home and personal needs, although with some difficulty (AR 247). He further noted that Plaintiff had received various forms of treatment, including medication, that had been successful in controlling her symptoms (AR 247-248). Finally, he found that his assessment was consistent with certain aspects of Dr. Hope's report (AR 248).

4

On May 26, 2009, Plaintiff was seen at the Pain Management Clinic at Meadville Medical Center (AR 294-295). Plaintiff reported experiencing constant pain that interfered with her ability to walk, drive and sleep (AR 294). Plaintiff stated that medications and cortisone injections had not helped alleviate her pain (AR 294). Plaintiff reported that she was able to wash dishes, cook, do the laundry, clean her home and read (AR 295).

On June 1, 2009, Plaintiff was seen by Tiffany Dorta, PA-C and Anthony Colantonio, M.D. (AR 289-292). Plaintiff reported constant right knee pain, which she described as throbbing, shooting, stabbing, sharp, pressing, wrenching and burning (AR 291). She stated that she struggled significantly with walking and required the use of a cane (AR 291). Plaintiff reported that physical therapy, injection therapy and anti-inflammatories had provided no relief (AR 291). Plaintiff's lower extremity examination revealed numbness and weakness in her right knee, and Dr. Colantonio noted that she had a "profound right antalgic gait" (AR 289-291). Examination of Plaintiff's left knee revealed no pain and she exhibited a good range of motion (AR 289). Dr. Colantonio assessed Plaintiff with nociceptive[3] and neuropathic pain affecting her right knee (AR 291). He started her on a medication regimen and ordered a lumbar MRI to assess Plaintiff for foraminal stenosis (AR 291). A lumbar MRI dated June 10, 2009 revealed minimal degenerative changes and no disc herniations were identified (AR 288).

On July 1, 2009, Plaintiff reported that her knee pain was "unbearable" and she had trouble sleeping (AR 287). Plaintiff stated that the Methadone made her nauseous and she was switched to a Duragesic patch (AR 287). On August 5, 2009, Plaintiff reported no sleep improvement with Ambien (AR 286). She reported a burning sensation under her right knee cap, and stated the Duragesic patch kept falling off (AR 286). She was started on MS Contin and amitriptyline (AR 286). On August 27, 2009, Plaintiff reported that the MS Contin made her sick and she requested the Duragesic patch (AR 285). She continued to complain of sleep difficulties (AR 285). On physical examination, Ms. Dorta reported that Plaintiff's right knee was tender and mildly swollen, and her calf was tender on palpation (AR 285). She was assessed

---

[3] Nociceptive pain is caused when nerve endings, called nociceptors, are irritated. *See* http://www.poweroveryourpain.com/understand/chronic/paintypes.

with chronic right knee pain and prescribed a Duragesic patch (AR 285). On September 24, 2009 Plaintiff complained of right thigh and hip spasms (AR 284).

An October 6, 2009 MRI of Plaintiff's right knee revealed severe narrowing of the medial compartment but no significant joint space effusion was evident (AR 283). An MRI with contrast dated October 20, 2009 showed moderate degenerative changes of the medial tibiofemoral joint compartment and some complex tearing of the medial meniscus (AR 281). On October 22, 2009, Plaintiff returned to Ms. Dorta and reported minimal improvement in pain control with the Duragesic patch (AR 280). It was noted that Plaintiff was being referred for a second opinion with respect to surgery (AR 280). Ms. Dorta found her extremity examination was within normal limits (AR 280).

Plaintiff returned to Ms. Dorta on December 7, 2009 who reported that her extremity examination was within normal limits (AR 279). Plaintiff complained of burning pain in her right thigh and sleep disturbances (AR 279). Plaintiff stated that she was told by the Hamot Orthopedic group that she was not a good candidate for a knee replacement (AR 279). A knee brace was ordered by Hamot and she was instructed to begin physical therapy (AR 279). Ms. Dorta reported that Plaintiff's case was "difficult" because she needed surgery, but was "not a good candidate" (AR 279). She indicated that Plaintiff would likely have to "settle for some partial degree of relief" with medications until surgery was pursued (AR 279). Plaintiff was continued on her current medication regimen and was to begin physical therapy after obtaining her brace (AR 279).

On January 19, 2010, Plaintiff complained of increased leg pain and a depressed mood (AR 278). She reported that she started wearing a knee brace before physical therapy two weeks prior and noticed no improvement (AR 278). Plaintiff claimed that her pain was "severe" following physical therapy (AR 278). Ms. Dorta stated that she "agree[d] with the second … opinion" and there was nothing more they could do for Plaintiff (AR 278). Plaintiff was assessed with knee pain and depression (AR 278). She was prescribed Effexor, her Neurontin dosage was increased, and an EMG of her right leg was ordered (AR 278).

6

On February 1, 2010, Plaintiff underwent an electrophysiologic evaluation (EMG) of her lower extremities, which was reported as normal (AR 274-277). On February 17, 2010, Plaintiff continued to complain of burning pain, but reported that her mood had improved with the Effexor (AR 273). It was noted that she had completed physical therapy and would be following up with orthopedics (AR 273).

Finally, on April 14, 2010, Plaintiff reported that she refused to attend physical therapy because it was too painful (AR 272). She reported that her medications and leg brace were ineffectual in controlling her pain (AR 272). She was assessed with knee pain and was continued on her medication regimen (AR 272).

Plaintiff and Samuel Edelmann, a vocational expert, testified at the hearing held by the ALJ on June 18, 2010 (AR 26-58). Plaintiff testified that she lived in a mobile home with her boyfriend and two children, ages twenty and seventeen (AR 32). Plaintiff testified that she was shot in the right knee in 1997 and had five surgeries (AR 37-38). She stated she stopped working in 2007 due to her knee problems (AR 33). She claimed she could no longer bend down, was unable to stand for long periods of time, was unable to walk, and had difficulty sitting (AR 38-39). Plaintiff also testified that she suffered from soreness and sharp pains in her left knee (AR 39). Plaintiff stated she had used a cane since 2007 but acknowledged she was able to walk without it (AR 40). She claimed her right knee was more painful than her left and was always swollen (AR 40-41).

Plaintiff testified that she no longer performed activities around the house and that her children helped her (AR 41). She no longer shopped for groceries or read, and had not driven since October 2009 (AR 46-48). Plaintiff claimed that her pain was constant and her medications caused drowsiness, blurred vision, a dry mouth and concentration difficulties (AR 42; 45-46). She stated she quit physical therapy because it exacerbated her pain (AR 43). Plaintiff testified that she would lie down four to five times per day for 30 minutes at a time (AR 45).

The ALJ asked the vocational expert to assume an individual of the same age, education and work experience as the Plaintiff, who was capable of lifting and carrying up to ten pounds

7

occasionally and two to three pounds frequently, and was capable of standing no more than two hours per day and sitting six hours per day with a sit/stand option every 20 to 30 minutes (AR 53). Such individual could perform occasional postural movements, but was precluded from kneeling, crouching, squatting or crawling (AR 53). The individual was further limited to simple, routine, repetitive tasks and minimal, if any, interaction with the public and coworkers (AR 53). The vocational expert testified that such an individual could perform the sedentary positions of a hand packager, assembler, and sorter/grader (AR 53).

Following the hearing, the ALJ issued his decision denying benefits to the Plaintiff (AR 12-22) and her request for review by the Appeals Council was denied (AR 1-3), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). She subsequently filed this action.

### III. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 1097, 229 (1938)); *see also Richardson v. Parales*, 402 U.S. 389, 401 (1971); *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson*, 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision or re-weigh evidence of record. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D.Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion … so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course

of making such findings."). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. § 706.

## IV. DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels. 42 U.S.C. § 1382(a). A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI. *Compare* 42 U.S.C. § 423(a)(1) with 42 U.S.C. § 1382(a). In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c). The ALJ found that the Plaintiff met the disability insured status requirements of the Act through December 31, 2012 (AR 14). SSI does not have an insured status requirement.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition. *See* 20 C.F.R. §§ 404.1520; 416.920. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume

9

previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Here, the ALJ concluded that Plaintiff had the following severe impairments: "degenerative joint disease (DJD) of the knees, status post 5 surgeries" but determined at step three that she did not meet a listing (AR 15-16). The ALJ described the Plaintiff's residual functional capacity as follows:

> …[T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except for the following: the claimant can lift/carry no more than 2 – 3 pounds frequently; the claimant can lift/carry no more than 10 pounds occasionally; the claimant can stand for 2 hours in an 8 hour work day; the claimant can sit for 6 hours in an 8 hour work day; the claimant must have the option to alternate sitting and standing every 20 -30 minutes; the claimant can perform no more than occasional postural activity, but the claimant cannot perform any kneeling, squatting, or crawling; the claimant can perform no more than simple, routine, and repetitive tasks; and the claimant can have only minimal interaction with coworkers and the public.

(AR 16). At the final step, the ALJ concluded that Plaintiff could perform the jobs cited by the vocational expert at the administrative hearing (AR 21). The ALJ also determined that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not fully credible (AR 17). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Plaintiff first argues that the ALJ failed to consider the medical evidence from the Meadville Medical Center. *See* Plaintiff's Brief p. 11. In evaluating a claim for benefits, the ALJ must consider all the evidence in the case. *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999). Where competent evidence supports a claimant's claims, the ALJ must adequately explain in the record his reasons for rejecting or discrediting competent evidence. *Sykes v. Apfel*, 228 F.3d 259, 266 (3d Cir. 2000). Without this type of explanation, "the reviewing court cannot tell if significant evidence was not credited or simply ignored." *Cotter v. Harris*, 642 F.2d 700, 705-07 (3d Cir. 1981); *see also*

*Plummer*, 186 F.3d at 429 (ALJ must give some reason for discounting the evidence he rejects).

Plaintiff's claim that the ALJ failed to consider the Meadville Medical Center records is incorrect. The ALJ's decision reflects that he considered and specifically cited to findings contained in these records, including the physical examination findings in June 2009, as well as the diagnostic studies in October 2009 and February 2010 (AR 19; 274-277; 283; 291). Plaintiff highlights a treatment note entry wherein she reported that she was unable to continue with physical therapy because it caused her too much pain (AR 271-295), as well as entries detailing her continued complaints of pain (AR 271-295). However, the ALJ discussed and cited to other treatment note entries detailing similar complaints by the Plaintiff (AR 18-19). The ALJ observed that Plaintiff alleged chronic knee pain, wore a brace and used a cane to walk (AR 19; 256-270). The ALJ further observed that Plaintiff refused to participate in physical therapy because it was too painful for her (AR 19; 262). Accordingly, we find no *Cotter* violation with respect to these treatment records.

Moreover, to the extent Plaintiff contends that these records support her claimed limitations, we observe that the treatment note entries Plaintiff points to do not contain a functional capacity assessment, or indicate that she was functionally limited in or precluded from working. These records demonstrate that despite Plaintiff's complaints of knee pain, she reported the ability to wash dishes, do the laundry, clean her home, and read (AR 295). In addition, her extremity examinations in October 2009 and December 2009 were reported as being within normal limits (AR 279-280). Therefore, we find no error in this regard.

Plaintiff next argues that the ALJ failed to accord her subjective complaints great weight. *See* Plaintiff's Brief p. 11. An ALJ must consider subjective complaints by the claimant and evaluate the extent to which those complaints are supported or contradicted by the objective medical evidence and other evidence in the record. 20 C.F.R. §§ 404.1529(a); 416.929(a); *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999). Once an ALJ concludes that a claimant has a medical condition that could reasonably produce the complained of symptoms, he or she must evaluate the intensity of the symptoms and the extent to which they impair the individual's

ability to work. *Hartranft*, 181 F.3d at 362. "This obviously requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." *Id*. In assessing subjective complaints, Social Security Ruling ("*SSR*") 96-7p and the regulations provide that the ALJ should consider the objective medical evidence as well as other factors such as the claimant's own statements, the claimant's daily activities, the treatment and medication the claimant has received, any statements by treating and examining physicians or psychologists, and any other relevant evidence in the case record. 20 C.F.R. §§ 404.1529(c); 416.929(a); *SSR* 96-7p, 1996 WL 374186 at *2. An ALJ may reject a claim of disabling pain where he "consider[s] the subjective pain and specif[ies] his reasons for rejecting these claims and support[s] his conclusion with medical evidence in the record." *Matullo v. Bowen*, 926 F.2d 240, 245 (3d Cir. 1990).

We find that the ALJ's assessment of the Plaintiff's subjective complaints of pain was consistent with the above standards. The ALJ's decision reveals that he reviewed the medical evidence of record and found that Plaintiff's claims of disabling pain were inconsistent with and exceeded the objective findings and subjective findings on physical examination (AR 19). In this regard, the ALJ cited to the objective diagnostic studies, observing that: x-rays of Plaintiff's right knee revealed degenerative changes and probable small knee joint effusion (AR 19; 221); x-rays of Plaintiff's left knee from August 2008 revealed only minimal degenerative change and an MRI showed only trace joint effusion (AR 18; 214; 223-224); an x-ray of Plaintiff's right knee from October 2009 revealed severe narrowing of the medial compartment, but no significant joint space effusion (AR 19; 283); an October 2009 MRI of Plaintiff's right knee revealed only moderate degenerative changes and some complex tearing to the medial meniscus (AR 19; 281); and a February 2010 EMG of Plaintiff's lower extremities was normal (AR 19; 274-277).

The ALJ also referenced several findings on physical examination, noting that Plaintiff was in no acute distress at her February 2009 office visit, and in March 2009 it was reported that Plaintiff was doing well, her muscle strength was 4-5/5 and equal in bother her upper and lower

extremities (AR 18; 257; 262). The ALJ observed that in June 2009 she had a full range of motion in her upper and lower extremities (AR 19; 289).

The ALJ further found that Plaintiff's testimony was inconsistent with and not supported by the medical evidence (AR 19). For example, the ALJ considered Plaintiff's testimony relative to her knee pain, as well as her recitation of restricted activities (AR 17). The ALJ observed, however, that Plaintiff worked after her alleged disability onset date, which he found "indicate[d] that the claimant's daily activities [had], at least at times, been somewhat greater than the claimant has generally reported" (AR 18). The ALJ further observed that the April 2009 consultative examination report showed that while Plaintiff used a cane to walk, she was independent with mobility and activities of daily living (AR 18). Finally, the ALJ concluded that Plaintiff's failure to attend physical therapy sessions recommended by her treating physicians, which could potentially ameliorate her pain, suggested that her symptoms were not as debilitating as she claimed (AR 19).

All of the above findings are supported by substantial evidence, and the ALJ adequately explained his basis for discrediting Plaintiff's claimed limitations and complaints of disabling pain. *See Hartranft*, 181 F.3d at 362 (holding that ALJ's credibility determination was supported by substantial evidence where ALJ found plaintiff's complaints about pain and other symptoms were inconsistent with the objective medical evidence, plaintiff's treatment regimen, and plaintiff's description of his daily activities); *Sternberg v. Comm'r of Soc. Sec.*, 438 Fed. Appx. 89, 96 (3d Cir. 2011) (holding that substantial evidence supported ALJ's credibility determination where he considered plaintiff's testimony, weighed it against various conflicting evidence in the record, and specified his reasons for finding plaintiff's subjective complaints of pain not entirely credible); *Harkins v. Comm'r of Soc. Sec.*, 399 Fed. Appx. 731, 735 (3d Cir. 2010) (same). Therefore, we find no error in the ALJ's credibility determination.

Plaintiff further challenges the ALJ's reliance on the opinion of Dr. Ali, the state agency reviewing physician, who reviewed the medical evidence of record and concluded that Plaintiff could perform a limited range of light work (AR 242-248). Plaintiff contends that the ALJ erred

13

in relying on this assessment in fashioning her residual functional capacity ("RFC")[4] because Dr. Ali was an ear, nose and throat specialist. It is well settled, however, that state agency reviewing physicians are "highly qualified … who are also experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(e)(2)(i); 416.927(e)(2)(i); *see also Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2012) ("State agent opinions merit significant consideration as well."). In addition, the ALJ did not rely solely on Dr. Ali's assessment in fashioning her RFC. The ALJ also discussed the objective diagnostic studies, findings on physical examination from the Plaintiff's treating physicians, and Plaintiff's own recitation of her activities, and concluded that Plaintiff could only perform sedentary work with a sit/stand option, occasionally perform postural activities, and was precluded from kneeling, squatting or crawling (AR 16). Accordingly, we find no error in the ALJ's partial reliance on Dr. Ali's opinion in evaluating Plaintiff's RFC.

Finally, Plaintiff contends that the ALJ failed to fully develop the record and relied on incomplete medical evidence. *See* Plaintiff's Brief p. 11. Plaintiff argues that the ALJ should have sought a more current assessment of her physical capabilities since Dr. Ali's assessment predated her most recent medical treatment. *Id*. This argument was recently rejected by the Third Circuit in *Chandler*:

> [B]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security Regulations impose no time limit on how much time may pass between a report and the ALJ's reliance on it. Only where "additional medical evidence is received that *in the opinion of the [ALJ]* … may change the State agency medical … consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing," is an update to the report required. The ALJ reached no such conclusion in this case.

---

[4] "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3rd Cir. 2000) (quoting *Hartranft*, 181 F.3d at 359 n.1; *see also* 20 C.F.R. § 404.1545(a). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. § 404.1527(e)(2). In making this determination, the ALJ must consider all the evidence before him. *Burnett*, 220 F.3d at 121.

*Chandler*, 667 F.3d at 361 (emphasis in original and footnote omitted) (quoting *SSR* 96-6p). Similar to *Chandler*, the ALJ made no such finding in this case. Therefore, we reject Plaintiff's contention that further development of the record was necessary.

## V.     CONCLUSION

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRENDA K. HOLLABAUGH | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 11-139 Erie |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## **ORDER**

AND NOW, this 7th day of September, 2012, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [ECF. No. 7] is DENIED, and the Defendant's Motion for Summary Judgment [ECF No. 9] is GRANTED. JUDGMENT is hereby entered in favor of Defendant, Michael J. Astrue, Commissioner of Social Security, and against Plaintiff, Brenda K. Hollabaugh.

The clerk is directed to mark the case closed.


                                            s/ Sean J. McLaughlin
                                              United States District Judge


cm:    All parties of record